(50 South. 735.)

No. 17,396.

Succession of KING.

(May 10, 1909. On Rehearing, Nov. 29, 1909.)

1. APPEAL BY CURATOR.

The curator of a vacant estate has a standing to appeal from a judgment awarding the estate to a claimant, to whom, in his opinion, it does not rightly belong.

2. EVIDENCE (§ 588*) — WEIGHT AND SUFFICIENCY.

Courts are unwilling to rest their judgments on the testimony of witnesses who are incapable of distinguishing between facts which are within their knowledge and those whose existence, without such knowledge, they are willing to take for granted and swear to.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2437; Dec. Dig. § 588.*]

On Rehearing.

3. APPEAL AND ERROR (§ 150*)—APPEALABLE INTEREST—EXECUTORS AND ADMINISTRATORS —RIGHT OF CURATOR TO APPEAL FROM JUDGMENT RECOGNIZING WIDOW AS HEIR.

Where, in the court below, there were only two claimants to the heirship, to wit, the alleged surviving widow of the deceased and the state of Louisiana, the unknown heirs being represented by an attorney appointed by the court, and a provisional judgment was rendered in favor of the widow, recognizing her as heir, but requiring her to give security as provided by law to restore the estate to any heir or heirs that should appear within three years, and the curator of the succession alone appealed from the judgment, held, that the said curator had no appealable interest in the controversy.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 150.*]

Monroe, J., dissenting.

(Syllabus by the Court.)

Appeal from Twenty-Second Judicial District Court, Parish of East Baton Rouge; H. F. Brunot, Judge.

In the matter of the succession of A. M. King. From the settlement of the provisional account, the curator appeals. Dismissed.

T. Jones Cross, for appellant. R. A. Tichenor, John D. Nix, and Pierson, Walton & Pierson, for appellee. Thos. J. Kernan, for absent heirs. Hubert N. Wax, Dist. Atty., for the State.

Statement of the Case.

MONROE, J. Decedent died in the parish of East Baton Rouge in April, 1905, leaving what was regarded as an intestate and vacant estate, of which appellant, claiming to be the largest creditor, was appointed curator, after a contest in which the state of Louisiana, Thomas E. McHugh, and M. F. Amrheim participated. In December, 1905, he filed a provisional account, showing assets to the value of $8,312.12 and debts (including his own claim for $944) to the amount of $2,792.92. The attorney for absent heirs opposed the claim of the curator, and in January, 1906, the account was homologated, so far as not opposed. Nothing further appears to have been done until September, 1907, when Mary C. Boehm, alleging that she is the widow, by first marriage of Frederic R. Lauth, and by second marriage of Edward King, alias Adam King, alias Allen M. King, appeared and claimed the

estate, as widow in the community and heir of the decedent, and thereupon the state intervened, and, opposing the claim so set up, asked that it be rejected. The attorney for absent heirs and the curator did likewise, and upon the issues so made there was judgment in favor of the widow, from which the curator alone has appealed.

The claimant, giving her testimony in April, 1908, tells substantially the following story: She would be 38 years old on May 10, 1908. She was married to F. R. Lauth in 1874, lived with him seven years, when she obtained a divorce, and was keeping a boarding house in St. Louis when, in December, 1883, she married a man calling himself Edward King, but who received letters addressed to Adam King, and who was sometimes called Jack King. He stayed with her a few days, then went away, and, returning in January, stayed five days, then went away again, and was gone two months, then came and went, sometimes making her a visit of an hour or two, until August 16, 1884, when he disappeared, and she never saw him afterwards. She says that at times (prior to his disappearance) he wrote to her, signing his letters merely, "Yours, King." She produces none of the letters. After his departure, she inspected his baggage, and found a notebook, two handkerchiefs, and a suit of "convict" clothes, and she destroyed the "baggage"; but whether she destroyed the notebook and the handkerchiefs she does not say. The notebook, which might possibly have aided her in this case, was not, however, produced, nor did she produce any scrap of the handwriting of her husband, which might have been compared with that of the man who died at Zachary. Being asked, "What kind of a looking man was King?" she replied:

"He was not a very tall man; say he was a little over five feet. He was short and muscularly built, well built. His weight was about 165 pounds or 170 pounds, somewhere about that."

She says that she heard, though she does not say when, that King was dead, "that several were killed in the mines, and that he was among them;" but she does not remember where "the mines" were, and she "did not hunt him up or try to find anything at all." After King disappeared, she went to Philadelphia, and remained there three years, then returned to St. Louis, where, about six years prior to the time at which she was testifying, she married Mr. Void, and, when testifying, was living either in New Orleans or Baton Rouge. She is asked:

"How long have you been living in New Orleans?"

And she answers:

"When I came here, first time, it was three years ago, when I came to Baton Rouge. I came here in November, and in May I heard of the death, and I have been here ever since the death of King."

She is asked:

"What brought you here?"

And she answers:

"I came here with Mr. Void, who is in business here."

She says that the man (King) whom she married told her that he had no relatives. She produces a marriage certificate, showing that Jeremiah Ryan, a justice of the peace in St. Louis, on December 20, 1884 (one year later than the date stated in her testimony), united in marriage—

"Edward King, of Alton, state of Illinois, and * * * Mary C. Boehm, * * * of St. Louis, who is over the age of 18 years."

James Spurlock, George Ward, and Mrs. W. B. Shouldis were examined, under commission, in New Orleans, as witnesses for the claimant, so that our Brother of the district court had not the advantage of hearing them testify and of observing them while so doing.

The testimony of Spurlock reads as follows:

"Interrogatory No. 1: What is the extent of your acquaintance with the late A. M. King, who died in the town of Zachary, La., some few years ago?

"Answer: I met Mr. King at a boarding house at which I was stopping, which boarding house was kept by the lady whom I now know as Mrs. Void, who resides in this city and claims to be the widow of Mr. King, and she is the widow of Mr. King, and there ain't no doubt about it. I afterwards met Mr. King in Zachary, La. I went to Zachary to do some work a few years ago, for a man named Tucker, who lives between 1½ and 2 miles from town. While I was in Zachary, I went into a store, and while I was there I saw Mr. King, and he looked at me, and I looked at him, and he said, 'I have met you before.' I said, 'Yes; but I don't know where.' King says, 'I guess it was in St. Louis, but we won't say anything about that.' And that was the last time St. Louis was mentioned, as he didn't seem to like for me to talk about it. Whenever I came to town I generally stopped at his place, because I felt like I knew him and didn't know anybody else, being a stranger there.

"Interrogatory No. 2: If you say that you are acquainted with the said Mr. King, please state when and where you first became acquainted with him, giving all the details.

"Answer: I have just told you that I met him at a boarding house kept by the lady whom I now know as Mrs. Void, who then claimed to be Mrs. King, and afterwards met him at Zachary, as I have just said.

"Interrogatory No. 3: Are you acquainted with the lady who is claiming, in these proceedings, to be the wife of the late A. M. King? If so, please state when and where you first became acquainted with her.

"Answer: Yes; I first met her in St. Louis. She was then keeping a boarding house; I afterwards met her in New Orleans, at a rooming house. * * * I wanted to get two rooms, together, in the house, so a lady said to me and the landlady that she would move back to another room, in the rear of the house, so that I could have two rooms, together, for my wife and children. The next day, when I saw this lady, she remarked, 'I have met you before,' and I said, 'Yes; but I can't place you.' She asked me if I was in St. Louis at any past time, and I then told her that I was, and that was just where I met her, at the boarding house kept by her who was known to me then as Mrs. King. She told me that King was dead, and I told her I had met him in Zachary. She told me that she had a notice of his death, and I asked her why she was living here and King was living in Zachary, and why she did not know anything about him. We talked about Mr. King for some time.

"Interrogatory No. 4: Please state whether or not you knew the Mr. A. M. King, of Zachary, by any other initials.

"Answer: I do not remember what Mr. King's initials were. All that I know is that the Mr. King I met at Zachary is the Mr. King that I met in St. Louis.

"Interrogatory No. 5: Please state whether or not you ever met the plaintiff in this suit in St. Louis, Mo. If so, when and under what circumstances, and whether or not you were ever introduced to her husband, giving the time and place and the description of the man who was introduced to you; also, give the name.

"Answer: As I said before, I met the plaintiff in this case in St. Louis, where she was keeping a boarding house. I stopped at her boarding house in St. Louis a few days, and, while I was there, I was introduced to a man as her husband—Mr. King. When I met him, in St. Louis, Mr. King was about 30 years of age, weighed 140 or 150 pounds, and was a little taller than I am, and I am 5 feet 9 inches. He was a man that had very little to say.

"Cross-Interrogatory 1: If you say that you were acquainted with A. M. King, state when and where was the last time you saw him; also, when and where was the first time you saw him.

"Answer: The last time, I met him in Zachary. The first time, I met him in St. Louis.

"Cross-Interrogatory 2: If you say that A. M. King died at Zachary, La., state how you know this to be a fact, and whether you were in Zachary at the time of his death; and, if so, whether you visited him during his last illness, and how often, and whether you attended his funeral.

"Answer: I was not in Zachary at the time of his death, and only knew about his death from what I heard.

"Cross-Interrogatory 3: If you say you saw a Mr. King in Zachary, La., at any time, state whether or not you had any conversation with him; and, if you say you did have conversations with him, state whether or not he admitted he was the same man, named King, whom you had previously met in St. Louis. Did you tell him that you had previously been acquainted with him? Did he admit to you that he had known you before meeting you in Zachary?

"Answer: He admitted us meeting in St. Louis, as I have told you already. The fact is, he was the first to mention it to me; but he did not seem to want to talk to me about the matter. While I was in the neighborhood, I went to Zachary quite often, and would spend the time with King, and we would drink together and have a good time; but I boarded at Mr. Tucker's.

"Cross-Interrogatory 4: Give an accurate description of the person you refer to, giving his height, weight, age, color of hair, color of eyes, and all his personal characteristics, either of body, mind, or character, that would serve to assist in his identification.

"Answer: As I stated before, Mr. King, when I knew him at Zachary, was 45 or 50 years of age, weighed somewhat more than when I knew him in St. Louis, and his hair was dark, with some gray in it. I don't know the color of his eyes, but think they were light.

He was strange, and did not talk much, as a rule, but was a deep man, and did not discuss his business affairs."

The same interrogatories and cross-interrogatories were propounded to the witness Ward and to Mrs. Shouldis.

Ward's testimony is, in substance, as follows: He lived in Zachary for many years before the Yazoo & Mississippi Valley Railroad was built, and for a few years afterwards. King kept a barroom, and he met him frequently; did some carpenter work for him, and talked to him on many occasions; is slightly acquainted with the lady who is claiming to be Mrs. King. She called to see him, at the Soldiers' Home, "about a year ago," and asked if he had known her husband; said King was her husband and had been missing for several years; never knew him otherwise than as A. M. King; never knew him until he met him at Zachary, but King told him that he once lived at St. Charles, which is several miles from St. Louis; also said that he had been in St. Louis, in East St. Louis, Ill., Mexico, and other places. He did not talk much, and seldom discussed his affairs, but his statement about St. Louis led witness to believe that he had been there; saw him, for the last time, about two months before he died. "Mr. King was a man about or nearly, six feet high, and weighed about 170 pounds." When witness first knew him, "he was about 40 or 45 years of age."

Mrs. Shouldis says: She never met King at Zachary, and does not know whether he is the Mr. King whom she met in St. Louis. About Christmas time, in 1884 or 1885, she was living in St. Louis, and was introduced by Mrs. Mary Boehm to a Mr. King, to whom Mrs. Boehm said she had been married. That lady is now living in New Orleans. Witness met her, she thinks, about 1905, and was told by her that she believed that the Mr. King who had died at Zachary was her husband.

Witness met her on the street in St. Louis, and it was then that she was introduced to Mr. King. He was not very large; could not say how tall. He was a quiet-spoken man and did not have much to say; looked like a laboring man. She never met him but once.

William McCarthy testified, in the presence of the court, about as follows: He lived in Zachary about 20 years; became acquainted with King in St. Louis in 1882. Witness was getting out timber, and King engaged a few hands for him; does not know where he lived. It was at a boarding house, and witness used to go around there every day or two. It was down town; does not know the street; went to the house and saw a woman. "The woman that I seen was about the height of that woman" (referring to the claimant), "but a little more fleshy." He and King went from St. Louis to Utica (in Tennessee). He (King) was getting out ties and timber; does not know how long he staid in Utica. King went back to St. Louis about twice a month. He went from Utica to Arkansas, and witness did not go with him, but met him afterwards at Rosetta (Miss.). He was at Rosetta a good while—six or eight months. Witness worked for him; next saw him at Zachary in 1887, he thinks, and there saw him frequently, and worked for him at times, in his barroom; waited on him in his last illness. When in health, he was a stout-looking man. Witness thinks he was about 26 or 27 years old when he came to Zachary, and about 41 when he died. He and King had talked about it, and witness was about six months the elder. Witness will be 43 on March 5th next (1909); is unable to say whether they staid in Utica a year—maybe more, maybe less. King never said anything to him about being married. He was a man of dissolute habits. He never talked of his family, or told where he came from.

Dr. W. G. Millican, sworn for the defense, says: That he is the curator of the

estate; is a practicing physician; lives in Zachary; had known King since the fall of 1885, or spring of 1886; was his physician from 1893 until he died. He never mentioned any relative, save an uncle, who, he said, had treated him badly; spoke of marrying a certain young lady, in the neighborhood, but said he was prevented by the interference of others. It was well known that he visited her.

T. H. Charlton (for the defense) says he is a farmer, and lives near Zachary; knew King since 1885 or 1886; was thrown with him a great deal; never heard him speak of his family, though he may, possibly, have spoken of a sister. "He was a great talker. If he got started, you would have to walk off and leave him." He and King talked of their ages, and, King would have been about 52 at the time witness was testifying.

J. W. Kirkwood (for defense) was marshal of Zachary for about 10 years; knew King; nursed him during the last 30 days of his life; became acquainted with him, probably, in 1886 or 1887; tried to get him to tell, shortly before he died, whether he had any relatives, but he declined to talk on that subject; said they could do no good; never intimated that he was married. He visited a young lady in the neighborhood; said he had a sister, but did not know whether she was living, and he spoke of an uncle. He was a great talker. "I would have to leave him while he was talking, get up and leave him talking on different subjects, when he got started. * * * After he died, I looked at the register's book. He was 49, when he died, according to the register." (Witness refers to the register of voters.)

### Opinion—On Motion to Dismiss Appeal.

The claimant, appellee, moves to dismiss the appeal, on the ground that the curator, appellant, is without appealable interest. The Code of Practice, however, provides:

"Art. 572. Tutors, curators and other persons, charged with the administration of another's estate, may appeal, for the benefit of the persons whose property they administer, if they deem an appeal necessary."

And the appeal in this case was granted to the "curator."

The motion to dismiss is, therefore, denied.

### On the Merits.

The claimant testifies in part as follows:

"I will be 38 years old the 10th of May."

She made that statement on April 27, 1908, from which it would follow that she was born on May 10, 1870. At another time, she is asked (on cross-examination):

"When were you married, the first time?"

And she replied:

"In 1874."

She then goes on to say that her first husband was Frederic R. Lauth; that she lived with him for seven years, and had three children; and that she then obtained a divorce from him, and in December, 1883, was married to Edward King. According to her sworn statements, therefore, she married Lauth when she was 4 years old, had three children by him, obtained a divorce, and was again married, before she had attained the age of 14 years. The certificate which she produced shows that she was married to Edward King in December, 1884 (instead of 1883), and thus she is allowed one more year for the accomplishment of the results mentioned; but it must, nevertheless, be admitted, either that she was an unusually precocious child, or else that she has fallen into some error in the giving of her testimony. She does not pretend, herself, to have identified the man who died at Zachary with the man whom she had married 21 years before in St. Louis. She swears that the man whom she married was "a little over 5 feet; he was short." Spurlock says that the man

whom he saw in St. Louis was a little taller than he, and that he measures 5 feet 9 inches. And Ward says that the man who died at Zachary was "about, or nearly, 6 feet high." There are but two witnesses whose testimony may be supposed to tend in the direction of identifying Edward King, who married the claimant, with Allen M. King, who died at Zachary; and their testimony does not go very far in that direction.

McCarthy in 1882 met in St. Louis the man whom he knew afterwards for years in Zachary, and whom, so far as appears from his testimony, he knew as Allen M. King, and not otherwise. But the claimant, who married Edward King, in December, 1884, testifies that she had known him, off and on, "say about a year," before she married him, so that the King with whom McCarthy became acquainted in 1882 was a person to whom she was not only not married, but whom she did not know, and there is no evidence in the record to show that she ever made his acquaintance. The only direct evidence which is left, tending to identify the vanished husband with the man who died at Zachary, therefore, is the testimony of Spurlock, and that testimony has certain peculiarities which prevents its acceptance as importing absolute verity. Thus, being under oath, he volunteers to say, in connection with his answer to the first interrogatory propounded to him:

"She is the widow of Mr. King, and there ain't no doubt about it."

But how could Spurlock know, with sufficient certainty to justify him in swearing to it so positively, that the claimant was the widow of Allen M. King, or of Edward King, or of any one else, when he had only her statement, made in casual conversation, that she had ever been married, and knew only by hearsay of the death of one of her supposed husbands.

The statement made, as it was, so early in his examination, and without any particular provocation, suggests an oversanguine temperament, and a disposition on the part of the witness to take for granted the main fact here at issue, and thereby so shakes the confidence of the judicial mind in the conservatism, or exactness, of the witness as to render recovery somewhat difficult, not to say impossible. When, therefore, he tells of his meeting with the man of Zachary and with the claimant, we are led to speculate as to whether such things as he describes could really be, or whether, perchance, he is again putting his temperament, instead of the facts which we need, in evidence.

Referring to his meeting with King, to whom he had been introduced, at a boarding house at which he had spent a few days, perhaps, 20 years before, he says:

"I saw Mr. King, and he looked at me, and I looked at him, and he said: 'I have met you before.' I said: 'Yes; but I don't know where.' King says: 'I guess it was in St. Louis; but we won't say anything about that.' And that was the last time St. Louis was mentioned, as he didn't seem to like for me to talk about it."

Referring to his meeting with the claimant, he says:

"The next day, when I saw this lady, she remarked: 'I have met you before.' And I said: 'Yes, I know you; but I can't place you.' She asked me if I was in St. Louis at any past time, and I then told her that I was, and that was just where I met her, at the boarding house kept by her."

If Spurlock had been the one to open the conversations above reported, and had done so by saying to each of the parties, "I have met you before," one might say, "Well, that is a habit." But for two people, who had not seen or heard of each other for more than 20 years, and between whom no collusion is charged, to select the same five words for the conveyance of an idea which might have been expressed in so many other ways, added to the meetings themselves, and to the fact that the other parties should both have recognized the witness, rather than he them, or either of them, was an unusual coinci-

dence. Another matter, in this connection, presents a psychological paradox, for which no theory, even of coincidences, seems to afford an adequate explanation. If King did not want to say anything about his meeting with Spurlock in St. Louis, why did he say anything about it? We find nothing in the record, and nothing, that we know of, in human nature, which throws any light upon that question; and, it being demonstrated that Spurlock, who alone lives to report what took place, is inexact at times, we are driven to the suspicion that there may be an error somewhere, and that King, instead of voluntarily and unnecessarily broaching a subject that was disagreeable to him, and, after making a single remark, closing his mouth (with reference to that subject) forevermore, really said nothing about it, and, in point of fact, that there was no such conversation. Now, it is true that Spurlock, in answer to other interrogatories propounded to him, says that the King whom he met in St. Louis and the King whom he met at Zachary were one and the same; but, what with his temperamental exuberances, his coincidences, and his paradoxes, we do not feel that his testimony would be a sufficient support for the judgment which the plaintiff claims, nor do we find any other testimony, which, in our opinion, would answer that purpose. We rather conclude that the claimant, being in the neighborhood, heard of the death of Allen M. King, and heard also, that he had left behind him some thousands of dollars, which nobody claimed, and which were likely to go to the state, for lack of a widow and heir, and, having had a husband named King, who had unaccountably to her disappeared, she became obsessed with the idea that she must necessarily be the person needed, and that her ship had arrived. We regret the necessity of awakening her from so pleasant a dream, but we are constrained to deal with the situation from somewhat a different point of view.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that the demand of the claimant, calling herself Mary C. Boehm, widow, by first marriage, of Frederic R. Lauth, and widow; by second marriage, of Edward King, alias Adam King, alias Allen M. King, be rejected, at her cost in both courts.

### On Rehearing.

LAND, J. In the reasons assigned for granting a rehearing of this cause, this court said:

"In this case, neither the state of Louisiana nor the attorney for absent heirs having appealed, and the court entertaining doubts whether the curator has sufficient interest to prosecute the appeal taken by him, it has been deemed advisable to grant a rehearing."

Since the granting of the rehearing on June 7, 1909, neither the state nor the attorney of absent heirs have taken advantage of the reopening of the case to prosecute an appeal and contest the judgment in favor of Mrs. Boehm.

The said judgment, having become final, concludes the state from disputing the status of Mrs. Boehm as the widow of the deceased. Hence the state can take nothing as heir, nor claim the custody of the balance in the hands of the curator on the ground that no heir has presented himself. Rev. Civ. Code, art. 1196. The judgment by its very terms does not conclude the unknown heir or heirs, but requires the widow to give security for the restitution of the estate in case any heir should come forward within the space of three years. Rev. Civ. Code, art. 931. The curator has no interest in the contest between Mrs. Boehm and the state, and cannot be permitted to appeal for the purpose of championing the claim of the state at the expense of the mass of the succession. The curator cannot appeal in

the interest of unknown heirs, because they are represented by the attorney for absent heirs.

The Civil Code requires that the surviving wife, claiming as heir, shall proceed to assert her rights contradictorily with a person appointed to defend the interests of the absent heirs. Articles 930–931; Succession of Allen, 44 La. Ann. 801, 11 South. 42. A decree of possession rendered without such appointment is null. Id. Hence the curator is a mere stakeholder and cannot represent the absent heirs.

Under the facts of the case, the reversal of the judgment would leave in the hands of the curator, after the payment of all debts and costs of administration, a considerable sum of money which the judgment precludes the state from claiming. The law does not contemplate any such result. The curator must deliver the balance in his hands to the heirs or pay the same to the State Treasurer. In paying to the heir who appears and is recognized by judgment of the court, the curator is fully protected. It is only when no heir appears that the curator is authorized to pay the balance into the state treasury.

Hence the curator has no appealable interest in this controversy.

The Civil Code does not contemplate that the curator should interfere in a case of this kind. The law provides for the citation of the attorney for absent heirs, and not of the curator, and further protects the interest of the unknown heirs by requiring the wife to give bond and security in their favor. The judgment below, in recognizing Mrs. Boehm as heir, orders her to give the security required by law.

The merit of Mrs. Boehm's claim cuts no figure in the consideration and determination of the motion to dismiss. However weak this claim may be, the state and the unknown heirs are precluded from contesting it by their failure to appeal, and the curator has no interest in the question.

It is therefore ordered that our former decree herein be vacated, and that this appeal be dismissed.

MONROE, J. I dissent, on the grounds stated in the original opinion.